CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
DEC 11 2018
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

DAVID B. BRIGGMAN, et al., )
)
   Plaintiffs, ) Civil Action No. 5:18-cv-00047
)
v. )
) By: Hon. Michael F. Urbanski
NEXUS SERVICES INC., et al. ) Chief United States District Judge
)
   Defendants. )
)

## MEMORANDUM OPINION

This matter comes before the court on plaintiffs David B. Briggman, Tania Cortes, and Richard W. Nagel's (collectively, "Plaintiffs") Second Motion for Leave to Amend Complaint (the "Second Motion"), ECF No. 23. For the reasons discussed below, the Second Motion will be **DENIED without prejudice** insofar as Plaintiffs seek to add state malicious prosecution claims, **DENIED with prejudice** insofar as Plaintiffs seek to add state claims based on Bowman v. State Bank of Keysville, 229 Va. 534, 331 S.E.2d 797 (1985), and **GRANTED** insofar as Plaintiffs seek to add federal claims under 18 U.S.C. §§ 2701 and 2707.

### I. Background

Plaintiffs are former employees of Nexus Services, Inc. ("Nexus"). Plaintiffs originally brought suit against Nexus, Michael Paul Donovan, the CEO of Nexus, and Erik G. Schneider, the Chief Risk Management Officer of Nexus (collectively with Nexus and

Donovan, "Defendants"), for violations of federal and state wiretapping statutes. Compl., ECF No. 1, ¶¶ 23–42.

Subsequently, Plaintiffs filed a Motion for Leave to File an Amended Complaint (the "First Motion"), ECF No. 18. Over a month later, after Defendants opposed the First Motion, Plaintiffs filed a Motion to Withdraw First Motion for Leave to File Amended Complaint (the "Motion to Withdraw"), ECF No. 22. Simultaneously with the Motion to Withdraw, Plaintiffs filed the Second Motion.[1]

Plaintiffs' proposed amended complaint (the "Amended Complaint" or "Am. Compl.") contains ten counts: (1) an existing claim for unlawful interception of oral and wire communications under 18 U.S.C. §§ 2511 and 2520; (2) an existing claim for unlawful interception, disclosure, or use of oral communications under Virginia Code §§ 19.2-62 and -69; (3) a new claim for unlawful access and procurement of stored communications under 18 U.S.C. §§ 2701 and 2707 (the "New Federal Claims"); (4) a new claim for wrongful termination/constructive discharge/hostile workplace (the "Bowman Claim"); and (5)–(10) new claims for common law malicious prosecution (the "Malicious Prosecution Claims").

Defendants argue that they will be unfairly prejudiced if the court grants the Second Motion. Defendants also contend that the court should deny the Second Motion as the Bowman Claim and the Malicious Prosecution Claims are futile. Defendants do not, however, argue that the New Federal Claims are futile.

---

[1] Given that the court is ruling on the Second Motion, the First Motion and the Motion to Withdraw will be **DENIED as moot.**

## II. Second Motion to Amend

Plaintiffs do not satisfy the timing requirements of Federal Rule of Civil Procedure 15(a)(1), and therefore may only amended "with with opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Nonetheless, "[t]he court should freely give leave when justice so requires." Id. The Fourth Circuit has "interpreted Rule 15(a) to provide that 'leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'" Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (en banc) (quoting Johnson v. Oroweat Foods Co., 785 F.2d 503, 509 (4th Cir. 1986)).

### A. Prejudice

In the amendment context, "prejudice" means "undue difficulty in prosecuting a lawsuit as a result of a change of tactics or theories on the part of the other party." Peters v. Bank of Am., N.A., No. 3:14-cv-513, 2015 WL 269424, at *3 (E.D. Va. Jan. 21, 2015) (quoting Lundy v. Adamar of N.J., Inc., 34 F.3d 1173, 1189 n.8 (3d Cir. 1994)).

Defendants' prejudice arguments take two forms. First, Defendants complain that "[o]f the proposed eleven (11) causes of action in the Amended Complaint, eight (8) are on behalf of Briggman alone and one (1) is brought by Briggman and Cortes (but not Nagel); only two (2) claims are pursued by all three Plaintiffs collectively." Defs.' Opp. Pls.' Mot. Withdraw Mot. Leave File Am. Compl. (the "Opposition" or "Opp."), ECF No. 24, at 7. Defendants never explain why the party structure amounts to prejudice sufficient to deny the Second Motion, however. Numerous complex cases have party structures at least as

3

complicated; add in counterclaims, third-party claims, and interpleader, and the Proposed Amended Complaint looks simple in comparison.

Defendants also complain that the Proposed Amended Complaint "transform[s] Plaintiffs' case from a straightforward wiretapping case consisting of four counts to an eleven-count complaint implicating numerous unrelated state and federal laws and factual circumstances." Id.

That might be the case, and that might constitute prejudice if this case were deep in the throes of discovery. But Plaintiffs represent that discovery has yet to begin. Indeed, Plaintiffs' First Motion was filed less than a month after Defendants answered the Complaint. The court finds that adding additional claims this early in the case does not amount to prejudice.

### B. Malicious Prosecution

The parties' briefs do not discuss a threshold question: whether the court has subject-matter jurisdiction to entertain the Malicious Prosecution Claims. If the court has concerns that subject-matter jurisdiction does not exist over claims, the court has a duty to raise jurisdiction sua sponte. See Brickwood Contractors, Inc. v. Datanet Eng'g, Inc., 369 F.3d 385, 390 (4th Cir. 2004) ("[Q]uestions of subject-matter jurisdiction may be raised at any point during the proceedings and may (or, more precisely, must) be raised sua sponte by the court.").

Section 1367 allows the court to exercise supplemental jurisdiction over state-law "claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). The test for

4

determining if the state-law claims "form part of the same case or controversy" is the familiar test from United Mine Workers of America v. Gibbs: "The state and federal claims must derive from a common nucleus of operative fact." 383 U.S. 715, 725 (1966); see also Axel Johnson, Inc. v. Carroll Carolina Oil Co., 145 F.3d 660, 662 (4th Cir. 1998) (applying Gibbs to Section 1367).

The "common nucleus of operative fact" rubric requires more than "superficial factual overlap" between the federal and state claims. Shavitz v. Guilford Cty. Bd. of Educ., 100 F. App'x 146, 150 (4th Cir. 2004) (per curiam). Instead, courts "must dig deeper and determine whether the state and federal claims have an essential element of proof in common." Schaller v. Gen. Dynamics Corp., No. 1:13-cv-658, 2013 WL 5837666, at *3 (E.D. Va. Oct. 28, 2013). This requires that both the federal and the state claims "revolve around a central fact pattern." White v. County of Newberry, S.C., 985 F.2d 168, 172 (4th Cir. 1993).

The Malicious Prosecution Claims are state claims. See Thomas v. Lamanque, 986 F. Supp. 336, 337–38 (W.D. Va. 1997). The parties are not diverse. See Am. Compl. ¶¶ 5–11. Since complete diversity does not exist between the parties, Plaintiffs rely on 28 U.S.C. § 1367, the supplemental jurisdiction statute, to establish jurisdiction over the Malicious Prosecution Claims. See id. ¶ 3 (invoking Section 1367).

After reviewing the Amended Complaint, the court holds that the Malicious Prosecution Claims do not arise out of the same common nucleus of operative facts as the federal claims. The federal claims involve the alleged illegal interception of Plaintiffs' communications. The date that Nexus began the recordings is unclear from the face of the

5

Amended Complaint, but the last recording alleged appears to have been made on April 14, 2017. Id. ¶ 18.

By contrast, the alleged malicious prosecutions began on April 24, 2017—ten days later and after Briggman had resigned—with Schneider filing a criminal complaint alleging petty larceny of paper towels and an electric power strip from Nexus' offices. Id. ¶ 42. From June 5, 2017 through September 6, 2017, Schneider also filed computer trespass and computer harassment criminal complaints, but those charges did not arise out of the allegedly intercepted communications underpinning the federal claims. Id. ¶¶ 45–53.

The court fails to see a common nucleus of operative facts between the federal claims and the Malicious Prosecution Claims. The factual question underpinning the federal claims is whether Defendants "intentionally intercept[ed], endeavor[ed] to intercept, or procure[d] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." DIRECTV Inc. v. Nicholas, 403 F.3d 223, 225 (4th Cir. 2005) (citing 18 U.S.C. § 2511(a)(1)). The factual question underpinning the Malicious Prosecution Claims is whether Defendants maliciously instituted criminal complaints against Briggman without probable cause. Hudson v. Lanier, 255 Va. 330, 333, 497 S.E.2d 471, 473 (1998).

There is no obvious intersection of facts between the two. There is no common element of proof. Nor do the claims revolve around a common fact pattern. To be sure, Plaintiffs allege that the both federal claims and Malicious Prosecution Claims arise from a concerted Nexus effort to persecute Briggman because of "his efforts to expose Nexus' malfeasance and seek unemployment compensation." Am. Compl. ¶ 56. But the court finds this connection far too tangential to support supplemental jurisdiction.

Because the Malicious Prosecution Claims do not arise out of a common nucleus of operative fact with the federal claims, the court cannot exercise supplemental jurisdiction over them. The court will dismiss these claims without prejudice so Plaintiffs may refile them in state court.

### C. Bowman Claim

In the remaining new claim, Plaintiffs allege that Defendants effected a constructive discharge of Plaintiffs by violating the Virginia Wage Payment Act, Va. Code § 40.1-29 (the "Wage Payment Act"), the Virginia Wiretap Act, Va. Code §§ 19.2-62 through 19.2-69 (the "Wiretap Act"), and the federal Electronic Communications Privacy Act, 8 U.S.C. §§ 2511–20 (the "ECPA").[2] Defendants claim that the Bowman Claim is futile. The court agrees.

#### 1. Bowman

Virginia is an at-will state: "[W]hen the intended duration of a contract for the rendition of services cannot be determined by fair inference from the terms of the contract, then either party is ordinarily at liberty to terminate the contract at will, upon giving the other party reasonable notice." Lawrence Chrysler Plymouth Corp. v. Brooks, 251 Va. 94, 97, 465 S.E.2d 806, 808 (1996).

---

[2] A brief aside about subject-matter jurisdiction is prudent. The court dismissed the Malicious Prosecution Claims for lack of subject-matter jurisdiction. The court declines to do the same with the Bowman Claim. The Bowman Claim, as it relates to alleged violations of the Wiretap Act and ECPA, arises out of the same common nucleus of operative fact as the federal claims, as the latter claims also arise out of the ECPA. It is much less clear that the Bowman Claim, insofar as it arises out of alleged violations of the Wage Payment Act, arises out of the same common nucleus of operative fact.

But Plaintiffs plead a single Bowman Claim: Defendants created an intolerable work environment by violating the ECPA, the Wiretap Act, and the Wage Payment Act. Pls.' Reply Supp. Second Mot. Leave Am. Compl., ECF No. 29, at 5 ("Plaintiffs argue that the cumulative effect of Nexus' malfeasance against the Plaintiffs—whether indicative of Bowman-worthy public policy statutes or otherwise—created circumstances of an intolerable nature which left the Plaintiffs no choice but to resign . . . ."). For jurisdictional purposes, the court need not parse out the individual components of the Bowman Claim. Instead, it suffices to say that there is a common element of proof between the federal claims and the Bowman Claim: Defendants allegedly violated the ECPA. That is sufficient for the court to exercise supplemental jurisdiction over the Bowman Claim under Section 1367. Schaller, 2013 WL 5837666, at *3.

In Bowman v. State Bank of Keysville, 229 Va. 534, 331 S.E.2d 801 (1985), the Supreme Court of Virginia recognized a narrow, public-policy based exception to the general at-will rule. The employee's discharge must be "based on violations of [statutory] public policy by the defendants." Id. at 540, 331 S.E.2d at 801. The Bowman exception is narrow, however:

> While virtually every statute express a public policy of some sort, we continue to consider this exception to be a "narrow" exception and to hold that "termination of an employee in violation of the public policy underlying any one [statute] does not automatically give rise to a common law cause of action for wrongful discharge."

Rowan v. Tractor Supply Co., 263 Va. 209, 213, 559 S.E.2d 709, 711 (2002) (alteration in original) (quoting City of Virginia Beach v. Harris, 259 Va. 220, 232, 523 S.E.2d 239, 245 (2000)).

The Supreme Court of Virginia has recognized three scenarios in which a Bowman exception will apply: (1) where "an employer violated a policy enabling the exercise of an employee's statutorily created right"; (2) where "the public policy violated by the employer was explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy"; and (3) "where the discharge was based on the employee's refusal to engage in a criminal act." Id. at 213–14, 559 S.E.2d at 211.

Importantly, a plaintiff must identify a Virginia—and not federal—statute that confers rights or duties upon him or any other similarly situated employee of the defendant. See Leverton v. AlliedSignal, Inc., 991 F. Supp. 486, 490 (E.D. Va. 1998); Dray v. New

8

Market Poultry Prods., Inc., 258 Va. 187, 191, 518 S.E.2d 312, 314 (1999); Lawrence Chrysler, 251 Va. at 98–99, 465 S.E.2d at 809.

Recently, the Supreme Court of Virginia refined Bowman, holding that the "termination itself" must "violate[] the public policy stated in the" relevant Virginia statute. Francis v. Nat'l Accrediting Comm'n Career Arts & Scis., Inc., 293 Va. 167, 174, 796 S.E.2d 188, 191 (2017); see also Vasquez v. Whole Foods Market, Inc., 302 F. Supp. 3d 36, 57 (D.D.C. 2018) ("The [Francis] court accordingly framed the question before it as whether 'a viable Bowman claim in this context would require a showing that the termination of employment itself violated the stated public policy of protection health and safety." (quoting Bowman, 293 Va. at 174, 796 S.E.2d at 191)).

In Francis, the plaintiff obtained a protective order under the Protective Order Statutes against a fellow employee after the employee "yelled obscenities at Francis, called her derogatory names, and threatened Francis" while at work. Francis, 293 Va. at 170, 796 S.E.2d at 189. A few days after the fellow employee was served the protective order, Francis' employment was terminated. Id.

Francis raised a Bowman claim based on violations of the Protective Order Statutes. The Virginia Supreme Court concluded that "[t]he Protective Order Statutes grant an individual the right to seek a protective order." Id. at 174, 796 S.E.2d at 191. Accordingly, "a viable Bowman claim in this context would require a showing that the termination of employment itself violated the stated public policy of protection of health and safety." Id.

The Francis plaintiff failed to satisfy that showing. She did "not allege that her termination itself . . . somehow endanger[ed] her health and safety," nor did "she allege that

9

[defendant] prevented her from exercising her statutory rights under the Protective Order Statutes." Id. at 174, 796 S.E.2d at 191–92. Instead, she merely alleged that "she was terminated because she exercised her rights under the Protective Order Statutes." Id. at 174, 796 S.E.2d at 192 (emphasis added). As Francis makes clear, then, a Bowman claim only lies when the termination itself violates the public policy expressed by the applicable statute.

### 2. Constructive Discharge

Plaintiffs do not allege that the termination of their employment violated the terms of an employment contract. Therefore, their cause of action arises out of Bowman. Additionally, Plaintiffs allege that they "were compelled to terminate their employment with Nexus"—not that Nexus terminated their employment. Am. Compl. ¶ 77. In other words, Plaintiffs allege constructive discharge.

"Constructive discharge occurs when a plaintiff's resignation is 'in violation of clear and unequivocal public policy of this Commonwealth that no person should have to suffer such indignities and that the employer's actions were deliberate and created intolerable working conditions." Wynne v. Birache, No. 1:09cv15, 2009 WL 3672119, at *3 (E.D. Va. Nov. 3, 2009) (quoting Padilla v. Silver Diner, 63 Va. Cir. 50, 57 (2003)).

Defendants dispute whether the Supreme Court of Virginia would recognize a constructive discharge Bowman claim. Because Plaintiffs' Bowman Claim is a state law claim, the court "has a duty to apply the operative state law as would the highest court of the state in which the suit was brought"—that is, Virginia. Liberty Mut. Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153, 1156 (4th Cir. 1992). The Supreme Court of Virginia has neither recognized nor rejected constructive discharge Bowman claims. See Faulkner v. Dillon, 92 F.

Supp. 3d 493, 498 (W.D. Va. 2015). Accordingly, the court must predict how the Virginia Supreme Court would decide the issue. See Liberty Mut., 957 F.2d at 1156. "In such circumstances, the state's intermediate appellate court decisions constitute the next best indicia of what state law is, although such decisions may be disregard if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." Id. (internal quotations and citations omitted).

Defendants urge the court to follow Hairston v. Multi-Channel TV Cable Co., No. 95-2363, 1996 WL 119916 (4th Cir. Mar. 19, 1996) (per curiam), an unpublished Fourth Circuit decision that declined to extend Bowman to constructive discharge claims, apparently because the court "was clearly concerned with the risk that federal courts would extend state law beyond any point recognized by Virginia's highest court." Faulkner, 92 F. Supp. 3d at 498–99.

As Defendants recognize in a footnote, however, courts have split on whether Hairston should be followed. See Opp. 11 n.4; accord Faulkner, 92 F. Supp. 3d at 499 (collecting cases). Moreover, Defendants fail to mention that since Hairston, "significant numbers of Virginia trial courts—but still not Virginia's highest court—have recognized constructive discharge." Faulkner, 92 F. Supp. 2d at 499. At this point in the litigation, the court agrees with Faulkner and finds that the Supreme Court of Virginia is likely to recognize a constructive discharge Bowman claim, assuming that all the other elements of a Bowman claim are met.

### 3. Bowman Claim Analysis

Plaintiffs base their Bowman Claim on two Virginia statutes—the Wage Payment Act and the Wiretap Act—and the ECPA.[3] Plaintiffs cannot base their Bowman Claims on the ECPA, however, because it is a federal statute. See Lawrence Chrysler, 251 Va. at 98–99, 465 S.E.2d at 809 (requiring plaintiff to identify a "Virginia statute establishing a public policy").

With respect to the alleged Wage Payment Act violations, Defendants recognize that under some circumstances, Virginia courts have allowed Bowman claims for Wage Payment Act violations. See Opp. 15 & n.6. Defendants instead rely on Vasquez v. Whole Foods Market, Inc., 302 F. Supp. 3d 36 (D.D.C. 2018), the only post-Francis case relying on Francis to adjudicate Bowman claims.

Vasquez held that violations of the Wage Payment Act does not give rise to a Bowman claim. Relying on Mar v. Malveaux, a Virginia appellate case, Vasquez found that "the Virginia Wage Payment Act does not itself confer a right on employees to receive pay," but instead "'establish[es] the public policy of the Commonwealth as <u>to the manner</u> in which employers pay wages to employees.'" Vasquez, 302 F. Supp. 3d at 57 (quoting Mar v. Malveaux, 60 Va. App. 759, 771, 732 S.E.2d 733, 738 (2012)). The Act "confers no right on employees to receive wages; that right instead is rooted in contract law." Id. Accordingly, "if the statutory right to seek a protective order to safeguard one's health and safety does not reflect a public policy to protect the exercise of such a right"—that is, the holding of Francis—"then surely the more passive right of receiving earned wage payments on a regular basis . . . cannot as a matter of public policy receive greater protection." Id. at 58.

---

[3] Because Plaintiffs do not allege that their constructive discharge arose from their refusal to perform illegal acts, Scenario 3 of Bowman does not apply.

The court finds Vasquez persuasive and adopts its reasoning. The court holds the Wage Payment Act does not "protect[] an employee's 'exercise' of her right to receive wages." Id. Accordingly, it necessarily follows that Plaintiffs' alleged constructive termination did not "violate[] a policy enabling the exercise of an employee's statutorily created right," as is necessary to establish a Bowman claim under Scenario 1. Rowan, 263 Va. at 213–14, 559 S.E.2d at 711. Nor does the Wage Payment Act set forth an explicit public policy necessary to prosecute a Bowman claim under Scenario 2. See id. Accordingly, Plaintiffs' Bowman Claim, to the extent it relies on violations of the Wage Payment Act, must be dismissed as a matter of law.

Plaintiffs' appeal to the Wiretap Act is similarly flawed. The Wiretap Act creates a duty to not to intercept certain electronic communications, see Va. Code Ann. § 19.2-62, but Bowman liability only attaches when an employer violates an employee's statutory rights.[4] The only right that inures to employees is the right to file a civil action when an employer (or anyone else subject to the Wiretap Act) violates the Wiretap Act. Id. § 19.2-69. There is no suggestion that Defendants interfered with that right, precluding a Bowman claim under Scenario 1. Indeed, one of Plaintiffs' original claims is for violations of the Wiretap Act, and Plaintiffs make no suggestion that Defendants attempted to interfere in their prosecution of those claims.

Nor does the court find Scenario 2 applies, as the court fails to find a "public policy violated by the employer [that] was explicitly expressed in the statute." Rowan, 263 Va. at

---

[4] Because the Wiretap Act prescribes criminal liability for violations, see Va. Code Ann. § 19.2-62, under Scenario 3, a Bowman claim would lie if the employer fired an employee if the employee refused to violate the Wiretap Act on behalf of the employer. Plaintiffs do not allege that this occurred.

13

213–14, 559 S.E.2d at 711. To the contrary, the Wiretap Act does not explicitly express any public policy, let alone a public policy that Defendants violated.

Plaintiffs cite a list of cases they suggest recognize that the ECPA "has been recognized as public policy and should be recognized as such here." Opp. 8. "[T]he Supreme Court of Virginia has forthrightly stated that Va. Code § 19.2-62 'is Virginia's version' of the ECPA." Glob. Policy Partners, LLC v. Yessin, 686 F. Supp. 2d 631, 637 (E.D. Va. 2009). Plaintiffs conclude that if the ECPA is public policy, then the Wiretap Act should be considered public policy for Bowman purposes, as well.

The problem is that the cases Plaintiffs cite never hold that the ECPA is a public policy, let alone an express public policy for Bowman purposes. Global Policy Partners, LLC v. Yessin merely states that the ECPA "prohibits intentionally intercepting any electronic communication." Id. Similarly, in Backhaut v. Apple, Inc., 74 F. Supp. 3d 1033 (C.D. Cal. 2014), the court did not have to determine whether the ECPA evinced a public policy because the defendant's only argument on the relevant claim was "that Plaintiffs ha[d] not pled viable predicate violations of" the ECPA. Id. at 1051.

Finally, in Pietrylo v. Hillstone Restaurant Group, No. 06-5754 (FSH), 2009 WL 3128420 (D.N.J. Sept. 25, 2009), the judge apparently left the jury to determine if the ECPA and corresponding New Jersey statute constituted public policy. Id. at *1 ("[A] jury trial commenced to determine whether the Defendants . . . wrongfully terminated Plaintiffs in violation of public policy."). Previously, the Pietrylo court held that determining if a violation of public policy occurred required "privacy interests [to] be balanced against the employer's interests in managing the business." Pietrylo v. Hillstone Rest. Grp., No. 06-5754 (FSH),

14

2008 WL 6085437, at *6 (D.N.J. July 25, 2008). No such balancing requirement exists under Bowman and its progeny, however.

Instead, the court must determine if the Wiretap Act expressed an explicit public policy. It does not. Therefore, Plaintiffs cannot, as a matter of law, plead a Bowman claim based on the Wiretap Act.

### III. Conclusion

For the reasons stated above, Plaintiffs' Second Motion will be **GRANTED** with respect to the New Federal Claims, **DENIED without prejudice** with respect to the Malicious Prosecution Claims, and **DENIED with prejudice** with respect to the Bowman Claim.

Entered: 12-11-2018

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge